**ROBIN HOOD FLOUR MILLS, LTD.,**
Plaintiff,

v.

**BAHAMA PEARL COMPANY, Ltd.,** Lincoln Chartering & Shipping Corporation and Dalton Steamship Corporation, Defendants.

**No. 62 AD. 1365.**

United States District Court,
S. D. New York.

Aug. 6, 1969.

Zock, Petrie, Sheneman & Reid, New York City, for plaintiff, Edwin K. Reid, Howard M. McCormack, New York City, of counsel.

Cichanowicz & Callan, New York City, for Dalton Steamship Corp., Michael J. Ryan, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is an action for cargo damage. Plaintiff Robin Hood Flour Mills, Ltd. (Robin Hood) is a Canadian corporation based in Montreal which deals in bulk lots of American and Canadian flour for export. It is a subsidiary of International Milling Company (International),

a Delaware corporation based in Minneapolis. International Milling Company, Limited (International, Ltd.) is a subsidiary of Robin Hood. Lake Milling Company is a trade name used by Robin Hood in its export business. Defendant Dalton Steamship Corporation (Dalton) is a Texas corporation with offices in Houston and New Orleans, engaged in business as a steamship agent (Plaintiff was unable to obtain jurisdiction over the other named defendants and they are not involved in this action).

Robin Hood shipped flour under its own name, in the name of International Ltd., and in the name of Lake in December of 1961; space for these shipments was engaged with defendant Dalton through Robin Hood's and International's freight forwarder, H. L. Ziegler & Co. (Ziegler). The shipments were made aboard the S/S CATALINA S, though Robin Hood ordered space to be booked on the S/S BAHAMA PEARL. It appears that the name of the CATALINA S was to be changed to BAHAMA PEARL, but that the change of name had not taken place at the time of the shipments. The shipments failed to reach their destinations, and Robin Hood brought this action, alleging that Dalton was a "carrier" under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq., and that Dalton had breached its warranty of authority to represent Talco, Inc., whose bills of lading had been used by Dalton for the shipments in suit.

The dealings between the parties commenced several months before the shipment in suit, after Dalton in August 1961 issued the following notice:

### DALTON STEAMSHIP CORPORATION
### SHIP AGENTS AND BROKERS

TO ALL FREIGHT FORWARDERS AND SHIPPERS:

WE ARE PLEASED TO ADVISE THAT WE NOW HAVE A REGULAR SERVICE FROM THE PORTS OF NEW ORLEANS AND HOUSTON TO BARBADOS, TRINIDAD AND CURACAO. OUR FIRST SAILING WILL BE THE S. S. "BAHAMA PEARL" WHICH IS SCHEDULED TO SAIL FROM NEW ORLEANS ON OCTOBER 20TH. AND HOUSTON ON OCTOBER 23RD. WE WILL HAVE SAILINGS ONCE A MONTH.

THIS BEING AN INDEPENDENT SERVICE WE ARE IN A POSITION TO NEGOTIATE RATES. PLEASE DO NOT HESITATE TO CONTACT US FOR ANY ADDITIONAL INFORMATION YOU MAY DESIRE.

THANKING YOU, WE ARE

YOURS VERY TRULY,
DALTON STEAMSHIP CORPORATION
(signed)

A. J. MOLERO
ASSISTANT TRAFFIC MANAGER

A copy of this notice was received by International sometime in October 1961, and a copy was sent to Robin Hood.

Shipping space for Robin Hood's shipments out of the Gulf of Mexico was arranged by International, which after checking its production department to determine whether the order could be delivered, would book the necessary space through its freight forwarder.

International would then notify Robin Hood of the details by telex. Mr. Seaman, International's Export Sales Office Manager, was in charge of these arrangements. International and Robin Hood used Ziegler as their forwarding agent in Houston and Galveston, and D. C. Andrews & Co. (Andrews) as their forwarding agent in New York and New Orleans. When booking requests were received from International, Ziegler would prepare the necessary documents for export, make the booking, and pay the freight on International's behalf. Ziegler and Andrews would send International copies of the contract of freight engagement in the usual course of business, which would normally be received by International within a week of their date.

Dalton was the agent for Talco, Inc., a small Panama steamship company, and kept blank Talco, Inc. bills of lading on hand at its offices. Dalton was not, however, acting as Talco's agent with regard to any of the transactions here involved. It was Ziegler's practice to request bills of lading from Dalton when arranging shipping space; the shipments in question were for the Caribbean, and the blank Talco, Inc. bills were Caribbean bills, so Dalton supplied Ziegler with the blank Talco, Inc. bills. Dalton's principal, Lincoln Chartering & Shipping Corporation, had not provided bills of lading of its own. After Ziegler had filled out the bills of lading, they were returned to Dalton, Ziegler preserving master copies. When the ship was loaded, the signed and dated bills of lading were returned to Ziegler by Dalton, generally one to two days after the vessel had sailed.

### The Shipment in Suit

In late 1961, International ordered Ziegler to book space for flour for shipment aboard the S/S BAHAMA PEARL to Georgetown, British Guinea, and Port of Spain, Trinidad. Ziegler, relying on earlier communications from International, contacted Dalton and executed three freight engagements for the shipments.

Each has the following heading:

FREIGHT ENGAGEMENT
DALTON STEAMSHIP CORPORATION
Fidelity Bank Bldg.—Houston, Texas

and at the bottom of each is:

(typed)    LINCOLN CHARTERING & SHIPPING CORP. ("CORP." omitted on the second and third engagements)

---

(printed)    DALTON STEAMSHIP CORPORATION—AGENTS

---

Murray Vansau, a clerk employed by Ziegler, testified in his deposition that copies of the second and third freight engagements, dated November 29, 1961, were mailed to International on December 1, 1961; he was not sure of the date on which the first engagement dated November 15, 1961, was mailed. Seaman testified that copies of freight engagements were usually received by his office at International a week after their date.

Sometime after December 6, 1961, Ziegler obtained blank "Talco, Inc." bills of lading, filled them out, indicating that the ship would be the S/S BAHAMA PEARL, and returned them to Dalton. The completed bills of lading have typed in above "S/S BAHAMA PEARL" the words "S/S CATALINA S TO BE RENAMED S/S BAHAMA PEARL AT NASSAU." There is nothing on the bills of lading to indicate that Talco, Inc. was not the carrier.

The vessel was loaded on December 22 and 23, and sailed on the 23rd. Seaman testified that he received copies of the bills of lading on December 29th; prior to receiving the copies, International was not aware that the shipment was going out on the S/S CATALINA S.

The S/S CATALINA S failed to complete her voyage successfully, and the shipments were damaged and not delivered to their intended destinations. General average was declared. The ship was sold at public auction at Nassau, and arrangements were made to have the ship towed to Port of Spain where the cargo was discharged and sold. This action ensued.

Plaintiff Robin Hood contends that Dalton breached its warranty of authority to represent Talco, Inc., the steamship company whose name appears on the bills of lading utilized in the transactions involved in this action. Defendant Dalton contends that it acted as the Gulf agent for Lincoln Chartering & Shipping Corporation, the charterer of the S/S CATALINA S, that it was not a carrier, and that Robin Hood knew that Dalton was acting as Lincoln's agent with regard to the transactions involved in this suit.

Robin Hood has not established by a preponderance of the evidence that it was not aware that Lincoln was Dalton's principal with regard to the transactions in suit; the evidence indicates that it did know that Lincoln was Dalton's principal. In addition to the freight engagements in the shipment in suit, which indicated that Lincoln was Dalton's principal and which did come to International's attention, the parties' prior dealings, after the notice of Dalton's service came to Robin Hood's attention, show that on numerous occasions Robin Hood and International were provided with information which clearly revealed to them Dalton's and Lincoln's status. These transactions included shipments made on October 20, 1961, and November 24, 1961.

*The October 20, 1961 Shipment*

In October 1961, a shipment of flour was made in Robin Hood's name to Messrs. K. R. Hunte & Co., Ltd., Bridgetown, Barbados, aboard the S/S AENOS. A freight engagement and a bill of lading related to this shipment indicate that Andrews was the forwarder. The freight engagement indicates that copies were sent to "International Milling Co., Attention Mr. Seaman" and "Lincoln Chartering & Shipping Corp., New York, N.Y." The freight engagement is headed "Freight Engagement" and beneath that is "DALTON STEAMSHIP CORPORATION." It is dated October 8, 1961 and is for space aboard the S/S BAHAMA PEARL for "FLOUR IN BAGS 80000#." "DALTON STEAMSHIP CORPORATION—Agents" is printed at the bottom, and directly above that is a printed line on which is typed, "LINCOLN CHARTERING AND SHIPPING CORP."

The bill of lading would have been received by International in the usual course of business. Printed at the top of the bill of lading is:

TALCO, INC.

PANAMA, R. P.

OWNERS AND OPERATORS

Dalton Steamship Corporation
General Agents

New Orleans—Houston—Galveston

The fine print of the bill of lading commences with the phrase "RECEIVED by TALCO, INC., hereinafter called the carrier." The lower left hand corner of the bill of lading contains a box for signature, date, and port, in which is printed "TALCO, INC.," underneath which is printed "Dalton Steamship Corporation, Agents." All the above references to Talco, Inc. on the bill of lading are defaced with horizontal lines of purple ink, and adjacent to each such reference is typed, in the same purple ink, "LINCOLN CHARTERING & SHIPPING CORP." (or "CORPORATION"). The information relating to the shipment is

filled in with the same ink. The bill of lading is stamped "COPY NOT NEGOTIABLE" and is dated "OCT 20 1961."

The bill of lading is filled out to indicate that the shipper is Robin Hood, that Messrs. K. R. Hunte and Co., Ltd. in Barbados, are the consignees, and that the shipment is "800/100# EX. COT.SACKS SASKANIA FLOUR." It also indicates that the shipment was actually made on the S/S AENOS, and not the S/S BAHAMA PEARL as indicated on the freight engagement.

*The November 24, 1961 Shipment*

Subsequent to that shipment, Robin Hood made another shipment aboard the S/S AENOS, again booked by International through its forwarder, with Dalton. This shipment was covered by 13 bills of lading, which are printed "TALCO, INC.", forms similar to the forms described above, except that "TALCO, INC." is not defaced on the various places on the form where it appears, and "LINCOLN CHARTERING & SHIPPING CORP." does not appear on the form; there is nothing on the face of the bills of lading to indicate that the carrier is anyone other than Talco, Inc.

The typed information added to the 13 bills of lading indicates shipments of flour to various consignees in the Caribbean; the ship is the S/S BAHAMA PEARL, but the typewritten "BAHAMA PEARL" is crossed out on the bills of lading and handwritten in on each above it is "AENOS." Mr. Sullivan, Export Sales Manager of Robin Hood, testified that it was only after copies of these bills of lading were received that Robin Hood was aware that the shipment went out on the S/S AENOS rather than the S/S BAHAMA PEARL. The bills are dated November 24, 1961, and were received at Sullivan's office about a week after the vessel cleared, in late November or early December 1961.

Mr. Seaman testified that a dispute arose as to the proper freight to be paid for this shipment. International communicated with Ziegler and asked whether anything could be done about the freight rate. Ziegler replied by telex that the freight rate had risen from $18.00 to $19.00 effective November 1, 1961, and that since they had delayed in making the booking until after that date, the $19.00 rate had been applied; their telex goes on to say, "THEY [Dalton] SAY NOTHING THEY CAN DO HERE NOW. IF U WAT TO CHECK WITH THEIR NEW YORK OR UR CALLING REPRESENTATIVE PLS DO SO AND SEE IF YOU CAN GET IT CHANGED." Evidently in response to this telex, Seaman telexed back an inquiry why Ziegler had not booked the shipment before November 1, 1961, to which Ziegler replied with an explanation, adding, "STILL THINK U COULD DO BETTER BY GOING TO NEW YORK ON THE NO NOTICE OF INCREASE GIVEN SHIPPERS. WE WERE NOT ADVISED OF THE INCREASE UNTIL ABOUT THE QXX 10TH." Seaman also called a friend of his who was in the freight forwarding business in New Orleans, a Mr. Jerry G. Tujague, and asked him to see what could be done. Seaman testified that Tujague informed him that he contacted Dalton and was told that Dalton could not effect rate adjustments, and that he should contact a Mr. Gorrissen of Lincoln Chartering & Shipping Corporation in New York.

Thereafter, Seaman wrote Mr. Gorrissen a letter dated November 22, 1961, addressed "PERSONAL ATTENTION, Mr. W. Gorrinssen, % Lincoln Chartering Co., 10 Rockefeller Plaza, New York, New York," with regard to the rate adjustment, enclosing papers connected with the transaction, and stating that "You will note we requested booking via Dalton steamer * * *" Mr. Gorrissen replied by letter dated November 29, 1961, on the letterhead of Lincoln Chartering & Shipping Corporation, agreeing to an adjustment of the rate for the shipment aboard the S/S AENOS, and referring to a telephone conversation of November 28th, the previous day. An International inter-office memo ob-

served that the refund is short by 100 cwt. because of an error, but that "we * * * feel it will be best not to push Lincoln for refund for such a small amount." A copy of this memo was sent to Mr. Lynner at the Montreal office of Robin Hood. Gorrissen's letter also states that Lincoln contacted Lynner with "the pleasant result that we booked 512 tons for the early December sailing."

The 512 tons booking referred to in Gorrissen's letter was confirmed by two letters; one is a letter from Gorrissen directly to Lynner of Robin Hood in Montreal, and the second is a reply thereto. The first letter, dated November 29, 1961, refers to "our telephone conversation of November 28," presumably the same conversation noted above, and confirms a booking for space aboard the S/S BAHAMA PEARL for a sailing from Houston on December 10th. The second letter dated December 1, 1961, from Robin Hood, confirms the rates stated in Gorrissen's letter, and according to Sullivan's testimony, adjusts the bookings. The bookings in Gorrissen's letter amount to 477 tons, and as adjusted by Robin Hood's letter amount to 530 tons; but according to Sullivan's testimony both letters refer to the 512 ton booking mentioned in Gorrissen's letter. The Dalton freight engagement dated November 20, 1961, covering this shipment, has printed on the bottom, "DALTON STEAMSHIP CORPORATION—Agents," and typed immediately above that is "LINCOLN CHARTERING AND SHIPPING." It was evidently prepared by Ziegler after Ziegler received a telegram from International for the order in the above amounts, and would have been received by International in the usual course of business.

Sullivan testified that Lincoln contacted Robin Hood directly about this booking at the suggestion of International, which usually handled Robin Hood's booking, so that the booking was initially by Robin Hood directly with Lincoln, although International thereafter communicated with Ziegler about the actual details.

The parties agree that the applicable law is that of the State of Texas, where the transactions occurred. The general principles of the Texas law of agency have been restated in the recent case of Anderson v. Smith, 398 S.W.2d 635, (Tex.Ct.Civ.App.1965). The court said that:

" * * * a person making or purporting to make a contract with another as agent for a disclosed principal is not himself a party to the contract and is not liable thereon. * * * if it be known that he is acting as an agent but the identity of his principal remains undisclosed, the agent is a party to the contract and is personally bound thereby." 398 S.W. 2d at 637.

The court also observed that the fact that the person with whom the agent deals might have means of discovering who his principal was would not relieve the agent of liability; the burden is on the agent to disclose his agency and his principal. The court held in *Anderson* that the receipt of checks signed by the principal Hal Anderson, Inc. was not sufficient to inform the recipient that the person it dealt with, Hal Anderson, was acting as an agent.

There is no question in this case that Dalton was acting as an agent, but Robin Hood contends that it failed to disclose its principal, as the bills of lading indicated that Talco, Inc. was Dalton's principal, which it was not, and Robin Hood was not informed that Dalton's actual principal for the transactions involved was Lincoln Chartering & Shipping Corporation.

As the narration of the facts proved at trial reveals, however, Robin Hood had abundant information as to Dalton's status as an agent and for whom it was acting as agent. The freight engagements for the October 20, 1961 shipment indicated that Dalton was acting as agent for Lincoln; although that shipment went out on the S/S AENOS, the booking was for the S/S BAHAMA PEARL, and the substitution should have indicated to Robin Hood that Dal-

ton was Lincoln's agent with regard to both ships, particularly since the bill of lading for the S/S AENOS also indicates that Dalton was acting as Lincoln's agent.

The November 24 shipment and the rate negotiations which followed, concluding in a direct booking of space on the S/S BAHAMA PEARL with Lincoln by Robin Hood, are also strong evidence that Robin Hood was aware that Dalton was acting as Lincoln's agent. Finally, the freight engagements for the shipments in suit also indicate that Dalton was acting as agent for Lincoln. The basis for Robin Hood's contentions lies in Dalton's use of the Talco bills of lading but in view of the other information available to Robin Hood as to Dalton's status and as to Lincoln, Robin Hood has not established that Dalton's principal was undisclosed. Talco was merely a name printed on a form which, the evidence reveals, Robin Hood knew nothing about and in which it had no interest. There is nothing in the record to suggest that Robin Hood relied upon Talco's being Dalton's principal. The evidence indicates that Robin Hood was interested only in the Lloyd's rating of the ships which it used.

■ In First State Bank of Roby v. Hilbun, 61 S.W.2d 521 (Tex.Ct.Civ.App. 1933), the court stated:

> "The rule that an agent acting without or in excess of authority is personally liable is subject to the qualification that the person dealing with him must have acted on the faith of the representation, express or implied, that the agent had the authority assumed and without knowledge of any want of authority on the agent's part. If therefore the agent fully discloses to the third person the facts concerning his authority, so that the latter may have the same opportunity of judging of the sufficiency thereof as the agent himself, or if the third person himself has actual or presumptive knowledge of those facts, the agent cannot be held personally liable, even though the principal is not bound."
> 61 S.W.2d at 522.

Here Robin Hood had notice, either directly or via International, that Lincoln was Dalton's principal, and dealt directly with Lincoln in connection with the earlier shipments. Moreover, the old but apparently still viable principle referred to but not applied in *Anderson, supra,* would appear to be applicable even if Robin Hood may not actually have been aware of Dalton's principal:

> "Some Texas authorities recognize that circumstances may exist which would put the person with whom the agent is dealing on 'notice of inquiry of the existence of a principal.' Veazie v. Beach Plumbing & Heating Co., Tex.Civ.App., 235 S.W. 695, no wr. hist.; Johnson v. Armstrong, 83 Tex. 325, 18 S.W. 594." 398 S.W.2d at 637, 638.

See also American Appraisal Co. v. Constantin, 98 S.W.2d 1003 (Tex.Ct.Civ. App.1936), and 2 Texas Jurisprudence Agency § 173 (1929). At the very least the information available to Robin Hood put it on notice to inquire whether Dalton's principal was in fact Lincoln Chartering & Shipping Corporation, or Talco, Inc. Robin Hood failed to make any inquiry.

■ Robin Hood contends that Dalton is a "carrier," and liable for damage to its shipments, under COGSA. COGSA defines a "carrier" as including "the owner or the charterer who enters into a contract of carriage with the shipper," 46 U.S.C. § 1301(a). Dalton was neither of these, and was not a carrier for the same reasons that it was not liable for breach of warranty of its authority. Compare Joseph L. Wilmotte & Co. v. Cobelfret Lines, S.P.R.L., 289 F.Supp. 601 (M.D.Fla.1968).

The foregoing constitutes the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a).

There being no just cause for delay (F.R.Civ.P. 54(b)), the Clerk shall enter judgment for defendant Dalton dismissing the complaint against it with costs.

It is so ordered.